# UNITED STATES NAVY–MARINE CORPS
# COURT OF CRIMINAL APPEALS

———————————————

## No. 201500039

———————————————

## UNITED STATES OF AMERICA
Appellee

v.

## PAUL E. COOPER
Yeoman Second Class (E-5), U.S. Navy
Appellant

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Robert Blazewick, JAGC, USN.
*DuBay* Hearing Judge: Commander Marcus N. Fulton, JAGC, USN.
Convening Authority: Commander, Navy Region Southeast, Naval
Air Station, Jacksonville, FL.
Staff Judge Advocate's Recommendation: Commander N.O. Evans,
JAGC, USN.
For Appellant: Commander Donald R. Ostrom, JAGC, USN; Major
Benjamin A. Robles, USMC; Lieutenant Ryan W. Aikin, JAGC, USN.
For Appellee: Lieutenant Commander Justin Henderson, JAGC,
USN; Lieutenant James Belforti, JAGC, USN.

———————————————

Decided 7 March 2018

———————————————

Before MARKS, JONES, and WOODARD, *Appellate Military Judges*

———————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

MARKS, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of three specifications of sexual assault and one specification of abusive sexual contact, in violation of Article

120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012 ed.).[1] The members sentenced the appellant to five years' confinement, forfeiture of all pay and allowances, reduction to pay grade E-1, and a dishonorable discharge. The convening authority (CA) approved the sentence and, with the exception of the punitive discharge, ordered it executed.

The appellant alleges ten assignments of error (AOE), four of which involve ineffective assistance of counsel: (1) ineffective assistance of counsel because trial defense counsel did not submit the appellant's three requests for individual military counsel (IMC), did not challenge the testimony of the government's key expert witness, and did not rebut that testimony with their own expert witness; (2) legal and factual insufficiency; (3) the military judge's erroneous exclusion of hearsay evidence offered to prove the appellant's innocent state of mind; (4) deprivation of the appellant's Sixth Amendment right to counsel of choice and statutory right to IMC when trial defense counsel failed to submit the appellant's IMC requests; (5) improper admission of testimony in violation of the appellant's Sixth Amendment right to confront witnesses against him; (6) unlawful command influence by the CA for directing the Article 32, UCMJ, investigating officer not to consider any evidence under MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 412; (7) violation of the Fifth Amendment and Article 32, UCMJ, for referral of charges to a general court-martial after a wholly deficient Article 32, UCMJ, investigation; (8) ineffective assistance of counsel for failing to move to suppress a written statement seized from the appellant's backpack; (9) ineffectiveness for failure to question the victim about inconsistencies in her testimony; and (10) ineffective assistance of counsel for cumulative error.[2]

Finding merit in AOE 4, we set aside the findings and sentence. Disagreeing with AOE 2, we find the evidence legally and factually sufficient and authorize remand of the case with authority for a rehearing in our decretal paragraph. Finally, we find no merit in AOEs 6 and 7, which address the Article 32, UCMJ, hearing and the referral of charges.[3]

## I. BACKGROUND

The appellant, a Navy Reservist, was mobilized in support of Joint Task Force (JTF) Guantanamo Bay, Cuba, in August 2013. The afternoon of 27 October 2013, the appellant met Petty Officer Second Class (PO2) J.P. at a chapel service and, afterward, they returned to the trailer where he was

---

[1] The appellant was acquitted of a single specification of sexual harassment, a violation of Article 92, UCMJ, 10 U.S.C. § 892 (2012 ed.).

[2] AOEs 4-7, 9, and 10 are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] Setting aside the findings and sentence moots remaining AOEs 1, 3, 5, and 8-10.

billeted. The appellant claimed they engaged in consensual sexual intercourse and oral sex, but PO2 J.P. reported a sexual assault the next day.

Early in November 2013, the appellant learned he was under investigation for sexual assault. As he was assigned to duties in the office of the staff judge advocate for JTF Guantanamo Bay, the appellant worked for and in close proximity to a number of judge advocates from different branches of the armed forces. Sometime in late 2013, Captain (CPT) T.N., California Army National Guard, arrived and became the appellant's direct supervisor. In addition to their daily interactions in the office, CPT T.N. and the appellant formed an attorney-client relationship for legal assistance matters.

Charges were preferred against the appellant on 24 April 2014, and Lieutenant (LT) J.B., United States Navy, was detailed as his defense counsel. The appellant first spoke to LT J.B. by telephone on 30 April 2014, as she was stationed near Jacksonville, Florida. LT J.B. represented the appellant at an Article 32, UCMJ, investigative hearing in Florida on 28 May 2014. After the Article 32, UCMJ, hearing, the appellant decided to exercise his statutory right to request representation by IMC.

The appellant identified three attorneys as potential IMC. His first choice was Commander (CDR) G.M., United States Navy Reserve. The appellant discussed his desire to request CDR G.M. with LT J.B. After conducting some research, LT J.B. learned that CDR G.M. would be unavailable as an IMC based on his pending transition off of active duty. The appellant agreed not to pursue CDR G.M. further. Still concerned about his legal representation at his upcoming court-martial, the appellant identified Captain (Capt) J.N., United States Marine Corps as his choice for IMC. Capt J.N. had left Guantanamo Bay for a position as a trial counsel; thus, LT J.B. informed the appellant that Capt J.N. too was unavailable. At some point between identifying CDR G.M. and Capt J.N., the appellant also identified CPT T.N. (California Army National Guard), his supervisor and legal assistance counsel, as an IMC. He understood from LT J.B. that CPT T.N. was also unavailable. LT J.B. and an assistant detailed defense counsel, Lieutenant Commander (LCDR) N.G., ultimately defended the appellant at court-martial.

Following his conviction at court-martial and the start of post-trial confinement, the appellant contacted CPT T.N., since demobilized, in his civilian capacity for assistance with post-trial matters. In the course of reviewing the case file requested and received from LT J.B. and LCDR N.G., CPT T.N. discovered that LT J.B. had not submitted any IMC requests on the appellant's behalf. While there were records of LT J.B.'s inquiries into the availability of CDR G.M. and Capt J.N., there was nothing regarding CPT T.N.

On appeal, this court ordered the production of affidavits from trial defense counsel responding to the allegations of ineffective assistance of counsel and failure to request IMC. In her responsive post-trial affidavit, LT J.B. denied that the appellant ever broached requesting CPT T.N. as an IMC. Presented with these conflicting claims, this court ordered a hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1968).[4] The *DuBay* judge concluded that the appellant had asked LT J.B. to request CPT T.N. as an IMC, and CPT T.N. would have been reasonably available to represent the appellant at his court-martial.

## II. DISCUSSION

### A. Deprivation of the statutory right to IMC

The appellant alleges that he was deprived of his Sixth Amendment right to counsel of choice and his statutory right to IMC when his initial trial defense counsel (TDC), LT J.B., failed to submit his requests for IMC.

#### 1. *Sixth Amendment right to assistance of counsel*

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. The Sixth Amendment right to assistance of counsel has been interpreted not just as a single right but as a source of multiple rights criminal defendants and military accused enjoy with regard to legal representation. From case law, our superior court has named four elements of this constitutional right to assistance of counsel, "as applied in the civilian context." *United States v. Lee*, 66 M.J. 387, 388 (C.A.A.F. 2008). First is "'the right of a defendant who does not require appointed counsel to choose who will represent him.'" *Id.* (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006)). Second is the right to "'reasonably effective assistance'" from counsel. *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Third is the "'right to representation that is free from conflicts of interest.'" *Id.* (quoting *Wood v. Georgia,* 450 U.S. 261, 271 (1981)). The fourth and final element is the determination that "where assistance of counsel has been denied entirely, 'the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.'" *Id.* (quoting *Mickens v. Taylor,* 535 U.S. 162, 166 (2001) (additional citation omitted)).

##### a. Effective assistance of counsel and its denial

The distinctions among these elements of the Sixth Amendment right to assistance of counsel manifest even more clearly when analyzing whether one of them has been denied. What constitutes a deprivation of the right? Must an act or omission result in adversity or impairment, and must that

---

[4] Appellate Exhibit (AE) I-A.

impairment amount to some articulable prejudice? The Supreme Court established the seminal test for gauging deprivation of the right to effective assistance of counsel in *Strickland.* An appellant alleging ineffective assistance of counsel must show "that counsel's representation fell below an objective standard of reasonableness" and that "any deficiencies in counsel's performance must be prejudicial to the defense[.]"466 U.S. at 688, 692. Before announcing the extent of prejudice required for ineffectiveness, the *Strickland* Court summarized the standards applied in other contexts. "In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Id.* In cases where legal representation is "burdened by an actual conflict of interest," an ineffectiveness claim "warrants a similar, though more limited, presumption of prejudice." *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980) (holding that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief") (citation omitted)); s*ee also United States v. Hale*, 76 M.J. 713, 729 (N-M. Ct. Crim. App. 2017) (requiring no further showing of prejudice when the appellant's counsel suffered an actual conflict of interest and the conflict adversely affected the appellant's representation), *aff'd*, __ M.J. __, 2017 CAAF LEXIS 1166 (C.A.A.F. Dec. 20, 2017) .

For claims of ineffective assistance of counsel other than conflicts of interest, the *Strickland* Court required the appellant to show something more. Demonstrating that counsel error "impaired the presentation of the defense" was insufficient. 466 U.S. at 693 (internal quotation marks and citation omitted). "[I]t provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding." *Id.* The Court turned to tests for the materiality of an impairment, such as "materiality of exculpatory information not disclosed to the defense by the prosecution . . . and in the test for materiality of testimony made unavailable to the defense by the Government deportation of a witness[.]" *Id.* at 694 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872-74 (1982)). To filter out all but material impairments to representation, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* This became the standard of prejudice required to find that counsel's error deprived the defendant of the right to effective legal representation and necessitated setting aside the conviction.

b. *United States v. Gonzalez-Lopez* and denial of counsel of choice

More than twenty years later, the Supreme Court addressed the right to counsel of choice, the Sixth Amendment element missing from *Strickland*, in *Gonzalez-Lopez*. 548 U.S. at 144. The Court made clear that the elements of the Sixth Amendment right to assistance of counsel were not amenable to a one-size-fits-all approach.

At the trial level, the District Court had barred Gonzalez-Lopez's civilian counsel of choice from participating in his defense, joining him and his substitute counsel at counsel table, or contacting them. *Id.* at 143. The debarment arose from the desired counsel's alleged violations of rules of court and professional conduct. *Id.* at 142-43. On appeal, the Eighth Circuit Court of Appeals ruled that the District Court had misinterpreted the relevant rule of professional conduct, vacated Gonzalez-Lopez's conviction for violation of his "Sixth Amendment right to paid counsel of his choosing," and held that the "violation was not subject to harmless-error review." *Id.* at 143-44 (citations omitted).

The Supreme Court affirmed, dismissing the government's argument that *Strickland* controlled. The right to effective assistance of counsel was derived from the Due Process Clause of the Constitution and the Court's "perception that representation by counsel 'is critical to the ability of the adversarial system to produce just results.'" *Id.* at 147 (quoting *Strickland*, 466 U.S. at 685). "The right to select counsel of one's choice, *by contrast*, has never been derived from the Sixth Amendment's purpose of ensuring a fair trial. It has been regarded as the root meaning of the constitutional guarantee." *Id.* at 147-48 (citing *Wheat v. United States,* 486 U.S. 153, 159 (1988); *Andersen v. Treat*, 172 U.S. 24 (1898) (additional citations omitted)) (emphasis added). "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id.* at 148. Consequently, the right to choice of counsel is not conditioned upon the effectiveness of substitute counsel. "Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *Id.*

The Court went on to explain why deprivation of the right to counsel of choice, unlike other elements of the Sixth Amendment, constituted a "structural defect" and needed no demonstration of prejudice. *Id.* Most errors of constitutional dimension were "'trial error[s;]'" they "'occurred during presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.'" *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991)). On the other hand,

6

"'structural defects . . . defy analysis by harmless error standards because they affect the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" *Id.* at 148-49 (quoting *Fulminante*, 499 U.S. at 309-10) (internal quotations and alterations omitted)). With "little trouble," the Court concluded "that erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error.'" *Id.* at 150 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993) (internal quotation marks omitted)). "Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *Id.* The Court summed up its comparison of ineffective assistance of counsel and denial of counsel of choice by declaring that the "difficulties of conducting the two assessments of prejudice are not remotely comparable." *Id.* at 151.

The Court acknowledged that the Sixth Amendment right to counsel of choice is not unlimited. A civilian defendant who requires appointment of counsel because of indigence does not also enjoy the right to choice of counsel. *Id.* at 151 (citing *Wheat*, 486 U.S. at 159; *Caplin & Drysdale v. United States*, 491 U.S. 617, 624, 626 (1989)). Nor is there a right to representation by someone who is not a member of the bar or who is burdened by a conflict the client cannot waive. *Id.* at 152. Courts also have the right to balance the right to choice of counsel against fairness, the enforcement of rules or standards of practice, and maintenance of a calendar. *Id.* However, the *Gonzalez-Lopez* Court distinguished a court's discretion to limit who appears before it from a denial of choice of counsel. *Id.*

Like their civilian counterparts, military accused have the right to hire counsel of their choice, within similar limits and at no expense to the United States. But this case deals not with that right but rather the statutory right to IMC unique to the military justice system. We decline the appellant's invitation to include the right to IMC within the Sixth Amendment right to counsel and, for purposes of this opinion, consider the right to be rooted only in statute.

### 2. *Statutory right to IMC at courts-martial*

When facing a general or special court-martial, service members' statutory rights to counsel are "broader than those available to their civilian counterparts." *United States v. Spriggs*, 52 M.J. 235, 237 (C.A.A.F. 2000). Regardless of indigence, a military accused has the right to representation by detailed military counsel plus the right to hire civilian counsel at no expense to the government *and* "to select a particular military counsel in limited circumstances[,]" the right to IMC. *Id.* at 238. The justification for such expansive rights is "the unique nature of military life, in which members are

subject to worldwide assignment and involuntary deployment under circumstances when civilian counsel are not readily available." *Id.*

The military accused's right to choice of reasonably available IMC goes back more than a century—before the enactment of the UCMJ and the right to representation by an attorney before courts-martial. *United States v. Gnibus*, 21 M.J. 1, 5-7 (C.M.A. 1985). In 1916, Congress amended Article 17 of the Articles of War to grant a military accused "the right to be represented before the court by counsel of his own selection for his defense, if such counsel be reasonably available[.]" 64 P.L. 242, § 3, 39 Stat. 619, 653, 64 Cong. Ch. 418 (1916). Four years later, Article 17 was amended to incorporate the right to appointment of defense counsel, but the accused retained "the right to be represented before the court by counsel of his own selection, civil counsel if he so provides, or military if such counsel be reasonably available, otherwise by the defense counsel duly appointed for the court[.]" 66 P.L. 242, §52, 41 Stat. 759, 790, 66 Cong. Ch. 227 (1920). When Congress enacted the UCMJ in 1950, the new Article 38, UCMJ, afforded an accused "the right to be represented in his defense before a general or special court-martial by civilian counsel if provided by him, or by military counsel of his own selection if reasonably available, or by the defense counsel duly appointed pursuant to Article 27."[5] Art. 38, UCMJ (1951). Pending the appellant's court-martial, his right to IMC, as well as his right to counsel at courts-martial generally, still resided in Article 38(b), UCMJ:

> (1) The accused has the right to be represented in his defense before a general or special court-martial or at an investigation under section 832 of this title ([A]rticle 32) as provided in this subsection.
>
> (2) The accused may be represented by civilian counsel if provided by him.
>
> (3) The accused may be represented—
>
> (A) by military counsel detailed under section 827 of this title ([A]rticle 27); or
>
> (B) *by military counsel of his own selection if that counsel is reasonably available* (as determined under regulations prescribed under paragraph (7)).

10 U.S.C. § 838(b) (2012 ed.) (emphasis added).

---

[5] Article 27, UCMJ, addresses the appointment or detail of judge advocates as trial and defense counsel and directs their minimum qualifications and certification for competence.

Article 38, UCMJ, is further implemented in RULE FOR COURTS-MARTIAL (R.C.M.) 506, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.):

> (a) *In general*. The accused has the right to be represented before a general or special court-martial by civilian counsel if provided at no expense to the Government, and either by the military counsel detailed under Article 27 or military counsel of the accused's own selection, if reasonably available. The accused is not entitled to be represented by more than one military counsel.

R.C.M. 506(b) delineates those who are *not* reasonably available to serve as IMC by virtue of their duties or positions, such as trial counsel. Service secretaries may further define availability based on other factors; however,

> [a] person who is a member of an armed force different from that of which the accused is a member shall be reasonably available to serve as [IMC] for such accused to the same extent as that person is available to serve as [IMC] for an accused in the same armed forces as the person requested.

R.C.M. 506(b)(1). The procedures for requesting an IMC are also subject to secretarial prescription, but requests shall be made by an accused or detailed defense counsel and routed through trial counsel to the CA. R.C.M. 506(b)(2). In the Navy, "[d]efense counsel shall ensure IMC requests are forwarded per R.C.M. 506(b) . . . . All IMC requests will be submitted in writing. IMC requests for courts-martial will be routed via the trial counsel to the [CA]."[6] CAs shall deny the request "[i]f the requested person is among those not reasonably available under subsection (b)(1) of this rule or under regulations of the Secretary concerned[.]" R.C.M. 506(b)(2). But if the accused claims to have an attorney-client relationship with the requested counsel regarding a charge in question, or if the requested counsel "is not among those so listed as not reasonably available, the [CA] shall forward the request to the commander . . . to which the requested person is assigned." *Id*. The requested counsel's command "shall make an administrative determination whether the requested person is reasonably available in accordance with the procedure prescribed by the Secretary concerned." *Id*.

A request for IMC must pass through multiple hands, creating multiple opportunities for failure. Having explored how the Supreme Court assesses deprivation of the Sixth Amendment right to choice of counsel, we turn now to how military courts have assessed deprivation of our statutory right to IMC.

---

[6] Commander Naval Legal Service Command Instruction (CNLSCINST) 5800.1G § 1006a (24 Feb 2013).

### 3. *Deprivation of the right to IMC and presumptive prejudice*

Long before the Supreme Court found denial of the Sixth Amendment right to choice of counsel presumptively prejudicial in *Gonzalez-Lopez*, our superior court reached a similar conclusion in response to denial of the right to request IMC. In *United States v. Hartfield*, a staff legal officer improperly denied Chief Petty Officer Hartfield's request for "individual counsel," determining the requested counsel was unavailable and failing to refer the request to the CA. 38 C.M.R. 67, 68 (C.M.A. 1967). Without demonstration of harm or prejudice, the Court of Military Appeals (C.M.A.) found "the failure to refer accused's request for counsel to the [CA] for action to have been prejudicially erroneous." *Id*. Quoting *Glasser v. United States*, 315 U.S. 60, 76 (1942), our superior court concluded that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Id*. It is true that cases like *Cuyler* and *Strickland* have superseded *Glasser*, but we highlight the *Hartfield* court's adoption of *Glasser* for a different reason. Albeit tacitly, the C.M.A. equated the statutory right to IMC to the constitutional right to assistance of counsel and held that the standard of prejudice protecting the constitutional right extended to the statutory right.

Twenty years later, the C.M.A. explicitly held that deprivation of the statutory right to IMC was presumptively prejudicial. In *United States v. Beatty*, our superior court found that a military judge erred when he ruled that an accused was not entitled to request an additional IMC when facing new charges at a rehearing. 25 M.J. 311, 316 (C.M.A. 1987). Seaman Recruit Beatty's original IMC "performed ably at trial. However, deprivation of a statutory right to request counsel cannot be analyzed in terms of specific prejudice but, instead, mandates automatic reversal." *Id*. (citation omitted).

In *United States v. Allred*, this court presumed prejudice in a case that combined severance of the attorney-client relationship without good cause and improper denial of an IMC request. 50 M.J. 795, 801 (N-M. Ct. Crim. App. 1999). Private (Pvt) Allred formed an attorney-client relationship with Capt A. in anticipation of an administrative separation proceeding and later a court-martial. *Id*. at 797. When Pvt Allred was evacuated to the United States for a medical emergency and subsequent treatment, the court-martial charges were withdrawn and dismissed. *Id*. Based on this withdrawal and dismissal and Capt A.'s pending transfer to a new duty station, Capt A.'s chain of command deemed his attorney-client relationship with Pvt Allred terminated. *Id*. When charges were re-preferred against Pvt Allred, he requested Capt A. as his IMC. *Id*. at 799. Finding no existing attorney-client relationship between Capt A. and Pvt Allred, Capt A.'s new commander denied the IMC request based on Capt A.'s workload and distance from the site of trial. *Id*. at 801. This court subsequently found error in the failure to

recognize a continuing attorney-client relationship between Capt A. and Pvt Allred and abuse of discretion in denial of Pvt Allred's IMC request. *Id*. Governmental severance of Pvt Allred's attorney-client relationship with Capt A., "without good cause and without his consent," resulted in "denial of his statutory right to counsel of his own selection." *Id*. Citing Article 59(a), UCMJ—our authority to reverse "on the ground of an error that materially prejudices the substantial rights of an accused"—this court presumed prejudice "arising from the denial of" the right to IMC. *Id*.

With this case law regarding deprivation of these constitutional and statutory rights to counsel in mind, we turn to the *DuBay* judge's findings of fact and conclusions of law with regard to deprivation of the appellant's statutory right to IMC.

### 4. *Deprivation of the appellant's right to IMC*

In his post-trial clemency submission and on appeal, the appellant has averred deprivation of his right to counsel under the Sixth Amendment and Article 38, UCMJ, stemming from LT J.B.'s failure to submit three IMC requests. We decline to characterize the right to IMC as constitutional and limit our analysis to potential deprivation of a statutory right.

At the request of the government, this court ordered affidavits from the appellant's two TDC addressing, *inter alia*, their "alleged failure to submit requests for [IMC] on the appellant's behalf."[7] Both trial defense counsel submitted affidavits rebutting this allegation.[8] Nevertheless, one factual dispute remained—whether the appellant informed his trial defense counsel that he wanted to request CPT T.N. as an IMC.[9] Seeking additional facts to resolve this dispute, we ordered a hearing pursuant to *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997) and *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967).

We begin with the *DuBay* judge's findings of fact, which we review "under a clearly erroneous standard[.]" *United States v. Wean*, 45 M.J. 461, 463 (C.A.A.F. 1997). We also "necessarily defer to the *DuBay* judge's determinations of credibility in this regard." *Id*. (citing *United States v. Williams*, 37 M.J. 352, 357 (C.M.A. 1993); *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993)).

---

[7] NMCCA Order of 14 Oct 2015 at 1.

[8] Appellee's Response of 28 Oct 2015, Appendix 2 at 2; Appellee's Corrected Response of 30 Oct 2015, Appendix 1 at 2-9.

[9] Lead trial defense counsel LT J.B. wrote, "[a]t no time prior to contacting CPT [T.N.] did YN2 Cooper ask me to have him as IMC." Appellee's Corrected Response, Appendix 1 at 7.

a. Did the appellant request CPT T.N. as an IMC?

The first question posed to the *DuBay* judge was, "[d]id the appellant ask his trial defense counsel to request [CPT T.N.], California Army National Guard, as an [IMC]?" The *DuBay* judge answered in the affirmative, making the findings of fact below. We agree with the factual support the *DuBay* judge cited in the record and conclude that his findings were not clearly erroneous. Thus we adopt the findings below, adding our own numbering scheme.

> 1. The [sexual assault] allegations came to the appellant's attention around 1 November 2013. The appellant went to [Region Legal Service Office] Southeast's office at Guantanamo Bay to seek defense services. A service member at the office, however, told him that he was not eligible for defense services. [The *DuBay* judge] credited the appellant's uncontradicted account: "I was trying to get an attorney and trying to get help with the case. They [the Navy legal office] couldn't provide any assist—the only thing they could really tell me is that, you know, an attorney will be provided to me if charges are preferred."[10]

The record provides additional relevant facts. A Naval Criminal Investigative Service (NCIS) agent attempted to interrogate the appellant on 6 November 2013. The appellant acknowledged his Article 31(b), UCMJ, rights and "indicated he did not wish to answer questions and was going to seek legal counsel."[11] The appellant went to Region Legal Service Office Southeast's (RLSO SE) Guantanamo Bay Detachment in pursuit of legal counsel. RLSO SE was responsible for providing prosecution and command services to tenant commands and legal assistance to Sailors for civil, not criminal, legal matters. There was no judge advocate in Guantanamo Bay authorized to consult with Sailors on criminal matters. When the appellant requested legal advice for a criminal matter, such as being the subject of an active criminal investigation, RLSO SE personnel should have connected him to Defense Service Office Southeast (DSO SE) in Jacksonville, Florida, and facilitated a private telephonic consultation with a military defense attorney.[12] For unknown reasons, that did not happen in this case.

---

[10] *DuBay* Judge's Findings of Fact and Conclusions of Law, at 2 (quoting *DuBay* record at 66).

[11] AE IV at 11.

[12] CNLSCINST 5800.1G §§ 0602 and 1312.b provide for delivery of legal services, including consultation with defense counsel, to Navy personnel serving in remote locations.

2. CPT [T.N.] worked closely with the appellant within the [Freedom of Information Act] office. He also provided legal assistance to the appellant in two separate legal matters; one involving visitation rights with the appellant's son, and the other relating to a car accident. [13]

. . . .

3. CPT [T.N.] was aware that the appellant, in CPT [T.N.]'s words "had no one else to talk to, no one else to give him any guidance at all," and broadened his consultations with the appellant to include his military justice issues.[14]

4. On 30 April 2014, the appellant had his first meeting with his assigned a [sic] Navy defense counsel, LT [J.B.], JAGC, USN. The meeting occurred by telephone, since LT [J.B.] was stationed in Mayport, Florida, and the appellant was still stationed in Guantanamo. By then charges had been preferred, and the appellant was facing an Article 32[, UCMJ] investigation. The appellant was willing to have LT [J.B.] serve as his counsel for the Article 32 investigation. After the hearing, however, he wanted different counsel.[15]

5. The appellant's first choice of IMC was then-CDR [G.M.], JAGC, USNR. . . . LT [J.B.] recalls the appellant's request for CDR [G.M.]. LT [J.B.] discussed the request with her [Officer-in-Charge] . . . and determined that CDR [G.M.] was not a viable choice for IMC because he was a reservist. LT [J.B.] and the appellant agreed that LT [J.B.] would take no further steps to secure CDR [G.M.] as an IMC.[16]

6. After declining to pursue CDR [G.M.] the appellant crossed paths with CPT [T.N.] at the Windjammer, a base facility onboard Naval Station Guantanamo Bay. The appellant told CPT [T.N.] that his Article 32 hearing had gone poorly, and that he would not be able to have CDR [G.M.] as his IMC. CPT [T.N.] told the appellant that he was available and willing to be

---

[13] *DuBay* Judge's Findings of Fact and Conclusions of Law at 2 (quoting *DuBay* record at 237).

[14] *Id.*

[15] *Id.*

[16] *Id.*

the appellant's IMC. The appellant wanted CPT [T.N.] to be his IMC, and CPT [T.N.] told him to make the request.[17]

7. The appellant testified that he told LT [J.B.] that he wanted CPT [T.N.] to be his IMC, and LT [J.B.] testified that he had not. Both witnesses appeared credible on the stand. [The *DuBay* judge] conclude[d] that the appellant did make the request because there is sufficient circumstantial evidence supporting the appellant's version to convince [the *DuBay* judge] of the fact by a preponderance of the evidence.[18]

8. [CPT T.N.'s] testimony about his [telephone] conversation with LT [J.B.], and in particular the fact that she was aware of the conversation between the appellant and CPT [T.N.] at the Windjammer tended to corroborate the appellant's testimony and contradict LT [J.B.]'s recollection.[19]

9. At some point the appellant clearly came to believe that he could not have CPT [T.N.] as an IMC, and he made yet another request for an attorney that he had worked with in Guantanamo Bay, Capt [J.N.], USMC. . . . Capt [J.N.] understood that the appellant was asking him because the appellant's requests for [CDR G.M.] and [CPT T.N.] had been denied. [The *DuBay* judge] find[s] that [Capt J.N.] and the appellant exchanged the Facebook messages contained in Appellate Exhibit XXX-A, which convince [the *DuBay* judge] that the appellant was keen to get an IMC involved in the case, and that he was requesting attorneys he had worked with in Guantanamo Bay. These Facebook messages, which [the *DuBay* judge] considered as prior consistent statements of the appellant, tend to show that the appellant was under the impression that he could not have CPT [T.N.] as his IMC because [CPT T.N.] was still in Guantanamo Bay. While these messages do not directly corroborate the appellant's assertion that he had asked LT [J.B.] to request [CPT T.N.], they are at least corroborative of his desire to have an IMC from Guantanamo Bay, and that he would have liked to have had CPT [T.N.] as his IMC. In light of this evidence, it would have been odd if the appellant hadn't asked LT [J.B.] to request CPT [T.N.]—particularly since CPT [T.N.] had already been the

---

[17] *Id.* at 2-3.

[18] *Id.* at 3.

[19] *Id.*

appellant's legal assistance attorney and had discussed the sexual assault allegations with him in some depth.[20]

As the record supports these findings, and they are not clearly erroneous, we also conclude that the appellant communicated to LT J.B. his desire to request CPT T.N. as an IMC, and LT J.B. responded in a way that led the appellant to believe CPT T.N. was not available.

b. Was CPT T.N. available?

Secondly, the *DuBay* judge was ordered to determine: "[w]as [CPT T.N.] 'reasonably available' to serve as [IMC] for YN2 Cooper in accordance with Article 38, UCMJ; R.C.M. 506; JAGMAN § 0131; and any regulations applicable to California National Guard judge advocates?"[21] This second question called for findings of fact and conclusions of law. We review the conclusions of law *de novo*. *Wean*, 45 M.J. at 463.

With regard to this second question, the *DuBay* judge first found that:

10. For CPT [T.N.], a National Guard attorney executing orders under Title 10, the regulation defining 'reasonably available' is Army Regulation (AR) 27-10.

AR 27-10 § 5-7 starts with a presumption that all Army judge advocates certified in accordance with Article 27(b), UCMJ are reasonably available unless they are excluded by law or regulation. AR 27-10 § 5-7.c. contains a list of judge advocates not reasonably available under the regulation, such as general officers, instructors, etc. CPT [T.N.] was not in any status at the time of the IMC request that would have made him not reasonably available.

As CPT [T.N.] was not per se unavailable under AR 27-10 § 5-7.c., the commander of the organization to which he is assigned would have made a reasonable-availability determination upon consideration of all relevant factors, including a non-exclusive list of factors listed in paragraph 5-7d.(1)-(8) of the regulation.[22]

We find the *DuBay* judge correctly identified the regulation governing CPT T.N.'s availability to serve as an IMC. We agree that CPT T.N. was not in one of the positions considered *per se* unavailable under R.C.M. 506(b)(1) or AR 27-10. Thus "the commander or head of the organization, activity, or

---

[20] *Id.* at 3-4.

[21] NMCCA Order of 6 Apr 2016. The JAGMAN refers to Judge Advocate General Instruction 5800.7F (26 Jun 2012).

[22] *DuBay* Judge's Findings of Fact and Conclusions of Law, at 4-5.

agency to which [CPT T.N. was] assigned . . . [must] make [the] administrative determination whether [CPT T.N.] is reasonably available in accordance with the procedure prescribed by the Secretary concerned." R.C.M. 506(b)(2).

The *DuBay* judge found that Lieutenant Colonel (LTC) J.L.C., California Army National Guard, "who was CPT [T.N.]'s commander . . . would have actually made the availability determination had a request for CPT [T.N.] been forwarded."[23] When the *DuBay* judge analyzed the availability factors in AR 27-10 § 5-7.d., he considered LTC J.L.C.'s affidavit as well as testimony from CPT T.N., but he did not consider affidavits from CPT T.N.'s legal chain of command at JTF Guantanamo Bay. The record indicates that JTF Guantanamo Bay leadership disagreed sharply with LTC J.L.C. and CPT T.N. about at least one of the factors—the impact of CPT T.N.'s absence on the ability of his office to perform its required mission. JTF Guantanamo Bay likely would have challenged LTC J.L.C.'s authority to make the availability determination. It is likely there would have been a dispute as to CPT T.N.'s availability. With that said, the record also revealed that CPT T.N. left JTF Guantanamo Bay a month before the appellant's court-martial but remained on active duty. Failing to anticipate this complicated factual scenario, this court required the *DuBay* judge to determine CPT T.N.'s availability. The *DuBay* judge found that CPT T.N. would have been declared available. As the factual findings supporting the *DuBay* judge's determination of CPT T.N.'s availability are not clearly erroneous, we can find no fault in that legal conclusion.

The *DuBay* judge also made findings of fact and conclusions of law as to the attorney-client relationship between the appellant and CPT T.N. As the *DuBay* judge mentioned, the existence of an attorney-client relationship is relevant to the availability determination, in accordance with AR 27-10 § 5-7.e.

> Notwithstanding the provisions [regarding persons not reasonably available and reasonable availability determination], if an attorney-client relationship exists between the accused and the requested counsel regarding matters that relate solely to the charges in question, the requested counsel will ordinarily be considered available to act as [IMC]. The Chief, [United States Army Trial Defense Service] . . . will review all claims asserting the existence of a prior attorney-client relationship.[24]

---

[23] *Id*. at 5.

[24] AR 27-10 § 5-7.e.

16

The *DuBay* judge found that an attorney-client relationship between the appellant and CPT T.N., related solely to the charges in question, existed and continued to exist at the time of the appellant's IMC request for CPT T.N.[25] The appellant confided in CPT T.N. about the matter under investigation, and CPT T.N. offered advice about the appellant's rights and motions that could be filed at a subsequent court-martial. As to CPT T.N.'s intent in forming such a relationship with the appellant, the *DuBay* judge found that "CPT T.N. intentionally formed an attorney-client relationship with the appellant because he did not believe that the appellant's interests were being served by Navy legal channels after the appellant was told that he would receive counsel after charges were referred."[26] We agree with the *DuBay* judge that CPT T.N. initially formed an attorney-client relationship with the appellant for legal assistance matters but later expanded it to include the military justice matters at issue in the court-martial.

The *DuBay* judge went on to conclude that the attorney-client relationship would have warranted CPT T.N.'s availability "notwithstanding the factors listed in AR 27-10 § 5-7.d. (1)-(8)."[27] The availability of a requested counsel is weighed against the government's duty not to sever an attorney-client relationship without good cause or the consent of the client. *Spriggs*, 52 M.J. at 240. When considering the nature of an attorney-client relationship for the specific purpose of determining whether a *per se* unavailable counsel should be made available as an IMC, the relationship requires more than confidential communications about the charges in question. *Id.* "Such

---

[25] *DuBay* Judge's Findings of Fact and Conclusions of Law at 7.

[26] *Id.* The appellant's trial defense counsel was detailed upon *preferral*, not referral. This appears to be the *DuBay* judge's typographical error and not reflective of a misunderstanding on the part of CPT T.N. In the context of formation of an attorney-client relationship for legal assistance and military justice matters, the *DuBay* judge asked CPT T.N., "was there something different about this case that made you feel like, you know, you really had to occupy both fields [legal assistance and military justice] in that way?" *DuBay* record at 236-37. CPT T.N. replied:

> It's because that at JTF [Guantanamo Bay], they have no defense attorneys there. They had—I—I think they might have had somebody over on the [Naval Station] side that would dabble in some of that stuff, if memory serves, but they always told JTF troopers no, so they were—they didn't help JTF troopers, whether they were Sailors or in-service, it didn't matter, and it was—he had no one else to talk to, no one else to give him any guidance at all, and so under those circumstances, which were very unique to [Guantanamo Bay], I felt that it was necessary under those circumstances.

*Id.* at 237.

[27] *DuBay* Judge's Findings of Fact and Conclusions of Law at 8.

communications do not support the existence of an ongoing attorney-client relationship unless they reflect a bilateral understanding between an attorney and a client as to the ongoing nature of the services to be provided." *Id.* (citation omitted). The *DuBay* judge did not cite *Spriggs*, nor did he find facts demonstrating "both a bilateral understanding as to the nature of future representation and active engagement by the attorney in the preparation and pretrial strategy of the case." *Id.* at 241. Had CPT T.N.'s command declared him unavailable, the command and the Chief of Army Trial Defense Services would then have had to consider the potential severance of his attorney-client relationship. Without a bilateral understanding about future representation at the appellant's trial, the command and defense chief could legitimately have found that the relationship between CPT T.N. and the appellant did not overcome CPT T.N.'s unavailability.

But in light of the specific facts of this case, the exact nature of the attorney-client relationship for purposes of CPT T.N.'s availability is not dispositive. Even if JTF Guantanamo Bay had prevailed upon CPT T.N.'s chain of command in the California Army National Guard and deemed him unavailable and the nature of the attorney-client relationship had not necessitated availability, CPT T.N. left JTF Guantanamo Bay and redeployed to the United States in August 2013, one month before the court-martial. He remained on active duty and, theoretically, would have been available to represent the appellant at his court-martial. Perhaps more important, the existence of an attorney-client relationship between the appellant and a requested attorney who was not *per se* unavailable further compelled the detailed defense counsel to submit a written request for IMC to the requested counsel's command via trial counsel and the CA. Determination as to availability, and whether an attorney-client relationship necessitated it, "is a matter within the sole discretion of" the requested counsel's command. R.C.M. 506(b)(2).

We find that in light of the military judge's findings of fact, which are not clearly erroneous, his conclusions of law and determination that CPT T.N. was available as an IMC were correct. We further conclude that the appellant's understanding that CPT T.N. was unavailable was erroneous, and the possibility that he might have been found unavailable neither excused nor mooted LT J.B.'s failure to draft and submit an IMC request.

c. Waiver of the appellant's right to IMC

The government challenges the *DuBay* judge's finding that the appellant wanted CPT T.N. as his IMC with the appellant's words at trial. At arraignment, the military judge properly advised the appellant of his "right to be represented by military counsel of [his] own selection, provided that the

counsel [he] request[s] is reasonably available."[28] The appellant acknowledged that he understood and when asked whom he wanted to represent him, the appellant responded, "[LT J.B.], sir."[29] The military judge repeated the colloquy at a subsequent session of court when the appellant's assistant detailed defense counsel, LCDR N.G., first appeared. When asked whether any other counsel had been requested in the case, LCDR N.G. responded, "[n]o, your honor."[30] The appellant remained silent.

The government argues that the appellant's acknowledgement of his right to IMC, expression of his desire that LT J.B. represent him, and failure to contradict counsel's statements that no other counsel had been requested in the case render the *DuBay* judge's finding of fact clearly erroneous. And arguably, the appellant waived his right to IMC during these colloquies with the military judge. But such arguments fail to account for the requirement that a waiver of the statutory right to IMC be knowing and intelligent. *See United States v. Mott*, 72 M.J. 319, 327 (C.A.A.F. 2013) (citing *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)) (requiring that an accused's waiver of constitutional and statutory rights to counsel "be knowing and intelligent, and not merely voluntary"). The appellant knowingly, intelligently, and voluntarily waived his right to request CDR G.M. and Capt J.N. as IMC. There is no dispute that the appellant advised his counsel of his desire to request CDR G.M. and Capt J.N., that both were *per se* unavailable under R.C.M. 506(b), and that the appellant properly understood and agreed to the futility of requesting them.

To the extent the appellant waived his right to request CPT T.N. as an IMC, he relied on an erroneous representation of CPT T.N.'s unavailability. When asked why he named LT J.B. and not another attorney as his choice to represent him, the appellant testified:

> I had no reason to, like they had all been denied, you know. That was the last person I had, and after they asked who I wanted to be represented by. I didn't know to bring up other—other IMCs that had been denied, so at that time, like, I wanted [LT J.B.] to represent me because my other requests had been denied.[31]

Based on the fallacy of the appellant's belief, his waiver was not knowing or intelligent. We find no valid waiver of the appellant's express wish to request

---

[28] Record at 5.

[29] *Id.* at 6.

[30] *Id.* at 33.

[31] *DuBay* record at 58.

CPT T.N. as an IMC. LT J.B.'s failure to draft and submit an IMC request for CPT T.N. on the appellant's behalf constituted a deprivation of his statutory right to IMC.

> 5.  *Assessing the prejudice of the appellant's loss of his right to IMC*

Having determined that the appellant suffered deprivation of his statutory right to IMC, we must determine how to assess the prejudice, if any.

> a.  Choice of counsel, not effective assistance of counsel

First, we disagree with framing deprivation of IMC as ineffective assistance of counsel or applying the *Strickland* test. Even though we do not find a Sixth Amendment right to IMC, *Gonzalez-Lopez* is relevant and persuasive on this point. The *Gonzalez-Lopez* Court highlighted the separate and distinct origin of the *right to choice of counsel* and its independence from the *right to effective counsel*. 548 U.S. at 147-48. Congress has preserved the right to IMC for service members even after guaranteeing representation by detailed defense counsel before general and special courts-martial, regardless of financial need. The right to IMC is independent of the right to competent, effective detailed defense counsel. To enforce the right to IMC only if and when detailed defense counsel's performance is ineffective is to hollow out the right to IMC.

An appellant alleging ineffective assistance of counsel must not only allege a deficiency but also demonstrate "the counsel's deficient performance gives rise to a 'reasonable probability' that the result of the proceeding would have been different without counsel's unprofessional errors." *United States v. Akbar*, 74 M.J. 364, 371 (C.A.A.F. 2015) (quoting *Strickland*, 466 U.S. at 694). If defense counsel's error resulted in an IMC's absence from the trial defense team, the appellant would be required to demonstrate a reasonable probability that the missing IMC would have won a different result. Finding the difficulty of such a speculation "not remotely comparable" to the difficulty of assessing the prejudice of a trial error, the *Gonzalez-Lopez* Court declined to require such speculation from an appellant. 548 U.S. at 151.

> b.  Error incapable of assessment

The *Gonzalez-Lopez* Court held that the opportunity cost associated with denial of counsel of choice defies calculation. *Id.* at 150. Without CPT T.N. on his trial defense team, the appellant faced consequences just as "'unquantifiable and indeterminate'" as those faced by Gonzalez-Lopez. *Id.* (quoting *Sullivan*, 508 U.S. at 282). Whether the entitlement to counsel derives from the Constitution or statute, a "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *Id.* Before and after *Strickland*, our superior court

foreshadowed this holding in *Gonzalez-Lopez*. Relying on earlier Supreme Court analysis of the Sixth Amendment and Article 59(a), UCMJ, this court and the C.M.A. found deprivation of the right to IMC presumptively prejudicial. *See Beatty*, 25 M.J. at 316 (holding that the right to IMC "cannot be analyzed in terms of specific prejudice"); *Hartfield*, 38 C.M.R. at 68 (declining to "indulge in nice calculations as to the amount of prejudice arising from" the denial of IMC) (citation and internal quotation marks omitted); *Allred*, 50 M.J. at 801 (presuming prejudice "arising from the denial of" the right to IMC).

Deprivation of a right to IMC and the difficulty, if not impossibility, of quantifying the prejudice suffered is distinguishable from the more quantifiable prejudice suffered from *interference* with a right to counsel. In *Wiechmann*, the CA refused to recognize one of the detailed defense counsel, prohibited his participation in the Article 32, UCMJ, hearing, and excluded him from pretrial negotiations. 67 M.J. at 461. The Court of Appeals for the Armed Forces (CAAF) recognized that the CA "burdened [counsel's] representation of Appellant" and "adversely affected" and "restricted" Wiechmann's rights. *Id.* at 462-63. But Wiechmann waived much of the error when he entered into a pretrial agreement and "had the benefit of [counsel's] unrestricted assistance during the subsequent negotiations, completion of the agreement, entry of pleas, and other trial and post-trial proceedings." *Id.* at 463. The CAAF found that the CA's actions did not "constitute the type of error that is incapable of assessment[.]" *Id.* (citing *Gonzalez-Lopez*, 548 U.S. at 148-49; *United States v. Brooks*, 66 M.J. 221, 224 (C.A.A.F. 2008)).[32]

In *United States v. Hutchins*, the CAAF reached for the approach used in *Wiechmann* and cases "involving errors that produced an interference with the attorney-client relationship." 69 M.J. 282, 292 (C.A.A.F. 2011) (citing *Wiechmann*, 67 M.J. 456; *United States v. Rodriguez*, 60 M.J. 239 (C.A.A.F. 2004)). One member of Sergeant Hutchins' trial defense team terminated his attorney-client relationship and representation shortly before trial. A majority of our court found improper severance of the attorney-client relationship and concluded that "any attempt to assess prejudice would be speculative." *United States v. Hutchins*, 68 M.J. 623, 631 (N-M. Ct. Crim. App. 2010). The CAAF disagreed, finding instead "oversights and omissions in addressing the issue of severance." 69 M.J. at 292. These were "trial errors

---

[32] "The infringement of Appellant's rights in this case constituted a trial error that can be 'quantitatively assessed in the context of other evidence.'" *Wiechmann*, 67 M.J. at 463 (quoting *Gonzalez-Lopez*, 548 U.S. at 148) (internal quotation marks omitted). Assuming without deciding that the interference violated Wiechmann's Sixth Amendment rights, the CAAF assessed it for harmlessness beyond a reasonable doubt. *Id.* (citing *United States v. Morrison*, 449 U.S. 361, 364 (1981)).

that can be evaluated under the standard formula for assessing prejudice against the defense" and required the defense to "establish that the error produced material prejudice to the substantial rights of the accused." *Id.* (citing Article 59(a), UCMJ; *United States v. Acton*, 38 M.J. 330, 336-37 (C.M.A. 1993)).

Unlike the errors in *Hutchins* and *Wiechmann*, non-submission of the appellant's IMC request for CPT T.N. cannot be recast as a mere interference with or restriction upon his right to IMC. CPT T.N. was not forced to represent the appellant under some kind of handicap. Instead, the appellant's requested IMC was prevented from representing him at all. When the government is responsible for IMC's absence, as in *Beatty*, *Hartfield*, and *Allred*, the effect of the IMC's absence is not susceptible to quantification or assessment in context. Had the government deprived the appellant of CPT T.N.'s representation, precedent would support a finding of presumptive prejudice.

But the deprivation occurred within the appellant's attorney-client relationship with LT J.B. Although we can sometimes pierce the attorney-client privilege to investigate alleged errors, there are risks inherent in presuming prejudice from errors arising between attorney and client. *See, e.g. Acton*, 38 M.J. at 337 (finding no prejudice in an attorney's improper unilateral withdrawal from representation after the client fired him). Therefore we must balance harm to the appellant that defies quantification against circumstances arising in a protected relationship and outside the government's control.

c.  Material prejudice

Assuming without deciding that a presumption of prejudice is inappropriate in this case, we assess for material prejudice to the appellant's substantial rights to request an IMC. Art. 59(a), UCMJ. From the record of trial and the *DuBay* hearing, we find the following.

The appellant did not receive the level of legal services statutorily afforded to every Sailor, anywhere in the world. When the appellant learned he was suspected of sexual assault in November 2013 he was deployed to Guantanamo Bay, Cuba—exactly the kind of isolated location that prompted the creation of the right to IMC. *See Spriggs*, 52 M.J. at 238. He tried to schedule a telephone consultation with a judge advocate at DSO SE, as was his right. A representative of RLSO SE—the prosecution and command services command—turned him away. In the ensuing five months before charges were preferred and detailed defense counsel was assigned, the appellant turned to the attorneys in his office, including CPT T.N., for help. Troubled by the appellant's inability to obtain legal advice from the Navy, CPT T.N. exceeded the boundaries of his legal assistance relationship with

the appellant and advised him on the investigation and possible charges against him. CPT T.N. formed an attorney-client relationship with the appellant about the matters at issue to fill the Navy's gap.

Five months after the appellant left his NCIS interview to seek legal counsel, LT J.B. was detailed to represent him. Their attorney-client relationship was mostly a long-distance one. There is no indication in the record that either detailed defense counsel ever visited Guantanamo Bay as part of their pretrial preparation.

Dismayed by the course of his Article 32, UCMJ, investigative hearing at the end of May, the appellant identified three different attorneys as possible IMC. Two were *per se* unavailable, but CPT T.N. was not. While the available record does not reveal how the misunderstanding arose between the appellant and LT J.B., the appellant requested CPT T.N. as his IMC. Only CPT T.N.'s chain of command could have declared CPT T.N. unavailable. Nevertheless, the appellant relied on the misperception that CPT T.N. was unavailable.

CPT T.N.'s attorney-client relationship with the appellant preceded the appellant's relationship with LT J.B. and LCDR N.G. by months. CPT T.N. and the appellant had talked extensively about the case, in person, about the case since 2013. Finally, unlike LT J.B. and LCDR N.G., CPT T.N. was in Guantanamo Bay.

We need not and do not opine on the effectiveness of LT J.B. or LCDR N.G. Our superior courts have declared the folly of trying to compare the legal representation an accused might have received with desired counsel to the representation the accused actually received. But mindful of the risk of presuming prejudice from a detailed defense counsel's failure to submit an IMC request, we look further. In this case we find that a member of an agent of the government—RLSO SE—frustrated the appellant's right to legal advice early in the case. We find formation of an attorney-client relationship regarding the facts of this case in direct response to that frustration. And finally, we find deprivation of representation by that attorney, with whom the relationship was shared, through no fault of the appellant. The facts of this case lead us to conclude the appellant suffered material prejudice when his IMC request for CPT T.N. was never drafted and forwarded to CPT T.N.'s chain of command for consideration and possible approval.

Finding material prejudice to the appellant's substantial, statutory right to IMC, both from the incalculable prejudice suffered from deprivation of his right to request CPT T.N. as an IMC and the actual harm suffered, we find reversible error. Art. 59(a), UCMJ.

## B. Legal and factual sufficiency

Before we can return the record of this trial to the Judge Advocate General for remand to the CA with authority to order a rehearing, we must address AOE 2 and the legal and factual sufficiency of the sexual assault convictions.

We review the legal and factual sufficiency of evidence *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for the legal sufficiency of evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In resolving questions of legal sufficiency, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

 "For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [appellate court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. "By 'reasonable doubt' is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt." *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

The government's case against the appellant is not overwhelming. The day after the assault, the victim, PO2 J.P., went to the chapel to speak with a Religious Program Specialist (RP) who also happened to be a friend of the appellant. The RP testified that "[s]he said that she'd been—she may have been assaulted and wanted to file a complaint."[33] When the RP asked her if the encounter had been consensual, she replied yes, it was consensual. She also told the RP that she had made a mistake, but it was unclear to him what she considered to be her mistake.

---

[33] Record at 379.

PO2 J.P. was in the appellant's quarters voluntarily, and neither she nor the appellant had consumed any alcohol. She offered no reason for remaining in the appellant's bed, despite ample opportunity to flee, other than tonic immobility. The expert witness's testimony about tonic immobility was more informational and theoretical. There was no forensic evidence suggesting lack of consent, and the appellant's own statements implied his perception of a consensual encounter.

However, neither the record nor the appellant offers a credible motive for PO2 J.P. to fabricate her allegation of sexual assault. Although the evidence was not well-developed, PO2 J.P. did testify to a history of tonic immobility. Reviewing PO2 J.P.'s and the appellant's testimony, we find her to be the more credible party. The members, who were able to observe both PO2 J.P. and the appellant on the stand, apparently shared our assessment. While we do not defer to the members' findings, we do consider their opportunity to observe the witnesses in person.

Having given the evidence a fresh and impartial look, we are convinced beyond a reasonable doubt of the appellant's guilt.

## C. Article 32, UCMJ, hearing

Finally, we address AOEs 6 and 7 regarding the appellant's Article 32, UCMJ, investigative hearing. The appellant alleges UCI and a lack of due process stemming from a lack of evidence against him and ineffective assistance of counsel. Finding no merit in AOEs 6 and 7, there is no need for a new Article 32, UCMJ, investigative hearing or new legal advice to the CA pursuant to Article 34, UCMJ. Thus we need not vacate referral of his charges to court-martial in addition to authorizing a rehearing.

The appellant first raises UCI on appeal, but contrary to the government's brief, UCI is never waived. *See United States v. Riesbeck*, 77 M.J. 154, 2018 CAAF LEXIS 50, *28, n.5 (C.A.A.F. 2018).

The prohibition against UCI originates in Article 37, UCMJ:

> No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the

> action of any convening, approving, or reviewing authority with
> respect to his judicial acts.

Art. 37(a), UCMJ. UCI may be actual, resulting in actual prejudice to an accused, or apparent, with no discernible impact on an accused but resulting in a loss of confidence in the fairness of our military justice system.

An accused has the burden of raising a claim of UCI and must "(1) show facts which, if true, constitute [UCI]; (2) show that the proceedings were unfair; and (3) show that [UCI] was the cause of the unfairness. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994)). "[I]n an appellate context," this burden is not met "until the defense produces evidence of proximate causation between the acts constituting [UCI] and the outcome of the court-martial." *Id.* (citing *United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A. 1994)). If the appellant meets this burden, the burden shifts to the government to rebut "by persuading the appellate court [beyond a reasonable doubt] that the [UCI] had no prejudicial impact on the court-martial." *Id.* at 151.

Alternatively, an appellant may raise a claim of apparent UCI by showing "'some evidence'"[34] of "facts, which if true, constitute [UCI]" and that "this [UCI] placed an 'intolerable strain' on the public's perception of the military justice system because 'an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.'" *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F 2017) (citing *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (internal quotation marks omitted) (citation omitted)). If an appellant presents some evidence, the burden shifts to the government to rebut the allegations beyond a reasonable doubt by proving the proffered facts do not exist, that they do not constitute UCI, or that they do not place an intolerable strain on public perception of the fairness of the proceeding. *Id.*

As facts constituting UCI, the appellant proffers that "the [CA] directed the [Article 32, UCMJ,] investigating officer not to consider evidence falling under [MIL. R. EVID.] 412 or to hold any closed hearing to consider the admissibility of evidence under any exception to that rule."[35] He produces no "evidence of proximate causation between the acts constituting [UCI] and the outcome of the court-martial." *Biagase*, 50 M.J. at 150. In fact there is no

---

[34] *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F 2017) *(*quoting *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002) (internal quotation marks omitted) (additional citation omitted)).

[35] Appellant's Brief and Assignment of Error of 17 Sep 2015 at 54 (citing Commander, Navy Region Southeast memo of 22 May 2014).

indication in the record that the appellant ever tried to admit evidence under MIL. R. EVID. 412. Having failed to meet the burden of demonstrating some evidence of actual UCI, we will only consider whether the facts demonstrate some evidence of an appearance of UCI. We begin by considering a CA's authority with regard to Article 32, UCMJ, investigative hearings.

*1. R.C.M. 405*

As to who may direct a preliminary hearing in accordance with Article 32, UCMJ, R.C.M. 405(c) states:

> Unless prohibited by regulations of the Secretary concerned, a preliminary hearing may be directed under this rule by any court-martial [CA]. That authority may also give procedural instructions not inconsistent with these rules.

An Article 32, UCMJ, hearing—a prerequisite to referral of charges to general court-martial—necessarily precedes referral. "Because a military judge is not appointed to conduct proceedings until charges are referred to a court-martial," the CA, not a military judge, "exercises responsibility for pretrial matters that would otherwise be litigated before a judge in civilian proceedings[.]" *Wiechmann*, 67 M.J. at 461. Among pretrial matters is production of witnesses and evidence. With a handful of exceptions, the Military Rules of Evidence do not apply to pretrial investigations. R.C.M. 405(i) (2012 ed.). MIL. R. EVID. 412 is one of those exceptions.

*2. MIL. R. EVID. 412*

A rule of exclusion, MIL. R. EVID. 412 directs that:

> The following evidence is not admissible in any proceeding involving an alleged sexual offense except as provided in subdivisions (b) and (c):
>
> (1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.
>
> (2) Evidence offered to prove any alleged victim's sexual predisposition.

Subdivision (b) details exceptions to this exclusion. Subdivision (c) describes the procedures by which *military judges* conduct closed hearings to consider excepted evidence and determine its admissibility. MIL. R. EVID. 412(c) (emphasis added).

In this case, the CA directed the Article 32, UCMJ, investigating officer to:

> comply with the provisions of Articles 31 and 32, UCMJ, Rule
> for Court-Martial [sic] 405 and JAGMAN 0143. This includes

the requirements of [MIL. R. EVID.] 412, which I am explicitly directing prohibits you from considering evidence falling under that Rule or holding any closed hearing to consider the admissibility of such evidence under any exception contained in that rule.[36]

We find the CA's direction not inconsistent with the Rules for Courts-Martial or Military Rules of Evidence. The CA acted within his authority prescribed by R.C.M. 405. Thus his direction is not some evidence of UCI. Even in the context of apparent UCI, the appellant has not met his initial burden.

### 3. *Deficiencies in Article 32, UCMJ, hearing*

Finally, the appellant alleges that a witness gave "largely and verifiably false" testimony at the Article 32, UCMJ, hearing, and both the investigating officer and his trial defense counsel failed to challenge the witness on the claims. Having reviewed the record and briefings, we find no merit in the appellant's claim that he was denied his right to a thorough investigation under the Fifth Amendment and Article 32, UCMJ. *See United States v. Clifton*, 35 M.J. 79, 81 (C.A.A.F. 1992).

Finding neither UCI nor other error in the appellant's Article 32, UCMJ, hearing we need not vacate the original referral of his charges or order a new Article 32, UCMJ, hearing.

## III. CONCLUSION

The findings and sentence are set aside, and the record is returned to the Judge Advocate General of the Navy for remand to an appropriate CA with authority to order a rehearing.

Judge JONES and Judge WOODARD concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[36] Commander, Navy Region Southeast memo of 22 May 2014. JAGMAN 0143 governs spectators at proceedings, including Article 32, UCMJ, investigations.